# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
## STATESVILLE DIVISION
## CIVIL ACTION NO. 5:20-CV-00163-KDB-DCK

| | | |
|---|---|---|
| Catherine H. Barber Memorial Shelter, Inc., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **ORDER** |
| | ) | |
| Town of North Wilkesboro Board of Adjustment of the Town of North Wilkesboro, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**THIS MATTER** is before the Court on Plaintiff Catherine H. Barber Memorial Shelter, Inc.'s ("Shelter") Motion for Summary Judgment (Doc. No. 34) and on Defendants' Motion for Summary Judgment (Doc. No. 32). The Court has carefully reviewed the motion and considered the parties' briefs and exhibits. The Court finds that under North Carolina law the Shelter was entitled to issuance of the conditional use permit, and the Board's denial of the permit was not supported by substantial competent evidence, which is required to deny it. Alternatively, the Court finds that the conditional use permit requirement as applied to the Shelter violates the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution as there is no rational basis for differentiating the Shelter from other uses that do not require a conditional use permit. For these reasons and the others discussed below, the Court will **GRANT** Plaintiff's Motion for Summary Judgment (Doc. No. 34); **DENY** Defendant's Motion for Summary Judgment (Doc. No. 32) and enter Summary Judgment in favor of Plaintiff.

1

# I.     RELEVANT BACKGROUND

The Catherine H. Barber Memorial Shelter, the only homeless shelter in Wilkes County, North Carolina, opened in 1987. (Doc. No 35-18). From 1987 until 2019, the Shelter operated out of a home in North Wilkesboro located at 86 Sparta Road, but that residence was not always large enough to serve the Shelter's needs. *Id*. Therefore, by the end of 2018, the Shelter started looking for a new location. *Id*.

When it initially opened, the local zoning ordinance didn't regulate homeless shelters. (Compl., ¶ 52). However, in 2018, the Town of North Wilkesboro ("Town") added a homeless-shelter provision to its local zoning ordinance. *Id*. at ¶ 53. In the provision, a homeless shelter is defined as "a short- or long-term shelter for persons who lack a fixed, regular and adequate nighttime residence." North Wilkesboro Zoning Ordinance §3.2(B)(2)(c) (the "Zoning Ordinance"). The Ordinance sets strict limitations on where homeless shelters can be located, requiring homeless shelters to be in the highway-business district; be at least 250 feet away from residences, parks, and schools; adjoin public sidewalks; provide supervision; have at least 50 heated square feet per client; be in harmony with the area; and obtain a conditional use permit ("CUP"). *See* Zoning Ordinance §§ 11.4-11, 6.7.1.

The Town alleges that it determined which proposed land uses would require a CUP based on a legislative process that includes public input and examined the proposed land use's potential impact on the health, safety, welfare of the community, adjacent land uses, and the Town's comprehensive land use plan adopted in 2018. (Doc. No. 33-2). There are 128 uses in the highway-business district that only require a permit from Town staff, who have no discretion to deny it if the use complies with the zoning code. *See* Zoning Ordinance § 6.7 (table of uses). Only six uses other than a homeless shelter require a CUP (a car lot, race way, waste transfer station, cell-phone

tower, nightclub, and bed-and-breakfast). Zoning Ordinance at § 6.7. Homeless shelters are the only non-commercial use requiring a CUP and are also the only use providing overnight shelter to those in need that requires a CUP. For example, no CUP is necessary for addiction-rehab facilities, medical-rehab facilities, long-term care and nursing homes, emergency shelters, group homes, lodges, or hospitals. *Id*.

There are six criteria that the Town considers when deciding whether to grant a CUP: public safety; zoning compliance; no substantial injury to property values; area harmony; water and sewer availability; and conformity with the Town's general plan. *See* Zoning Ordinance § 3.4. To obtain a conditional use permit, the applicant applies with a fee, a completed form, explanation of the proposed use of the property, site plan, documentation of the facts supporting the application, and a list of neighboring property owners. *See* Zoning Ordinance §3.4(C). The applicant bears the burden of producing sufficient evidence at the hearing to demonstrate that the desired use complies with the Town's Ordinance. *See Id.*

In 2019, the Shelter applied for a variance from the Town of North Wilkesboro Planning Department to relocate to 108 Sparta Rd., where it planned to build a permanent facility. (Compl., ¶¶33, 34). The Board denied Plaintiff's request for a variance because the location was closer than 250 feet to a residence, in violation of the Zoning Ordinance, and because the location did not have a sidewalk, which would have required the Shelter's residents to walk in the highway. (Doc. No. 33-2). The Shelter did not appeal the Board's decision. (Compl., ¶35). In need of a new residence, the Crossfire United Methodist Church offered its second floor as a temporary location (Doc. No. 35-18). After a quick renovation, the Shelter moved in October 2019 (Doc. No. 35-20). In moving to Crossfire, the Shelter did not need to seek the Town's zoning approval because Crossfire is outside of the Town (Doc. No 35-24 Ex. 3).

In 2020, dentist Christopher Roberts and his wife Timberli donated the property at 106 Elkin Highway in North Wilkesboro, their former dental office, to the Shelter (Doc. No 35-20). According to the Shelter, the property is an ideal location and meets every requirement of the homeless-shelter ordinance. (Doc. No 35-20). In July 2020, the Shelter filed a CUP application (Doc. No 35-8) ("CUP Application") to move to 106 Elkin.

On August 26, 2020, the North Wilkesboro Board of Adjustment held a quasi-judicial hearing to discuss the Shelter's CUP application (Doc. No. 35-9). The Town's planning director testified that the application met all zoning requirements (Doc. No. 35-10). Carmen Daecher, then a Shelter board member and a traffic engineer, guided the Board through the Shelter's application. (Doc. No. 35-9 at 3). He explained the Shelter's operations, its plans to renovate 106 Elkin, and why the Shelter believed the location was ideal. The Shelter operates from 6:30pm – 6:30am and usually serves about 10 individuals. 106 Elkin Highway is centrally located to and within walking distance of inexpensive restaurants and nearby businesses and services the Barber Shelter's clients could use, particularly with the sidewalks. He also offered testimony from Dr. Alan Rice, the pastor of Crossfire United Methodist Church, and Derek Wyatt, the night manager at the Barber Shelter. *Id.* at. 3–5. Dr. Rice testified that he had not received a single complaint from neighbors and had no troubles with loitering or trash since the Shelter arrived. *Id.* at 5–6. And Mr. Wyatt testified about how the Shelter provides its clients breakfast and transportation each morning and how local police regularly bring people to the Shelter. *Id.* at 7–8.

In response, neighboring property owners or renters John Battle, Yvette Bushard, James Brown, and Scott Nafe testified against the CUP application. (Doc. No. 26-1 at 48). John Battle testified that the proposed location for the Shelter was one of the busiest commercial locations in North Wilkesboro and that the proximity of the sidewalk in front of the Shelter to the highway

could endanger the safety of the homeless people who would be using it primarily in the evening or early in the morning. (Doc. No. 26-1 p 50). Mr. Battle testified that occupants of the Shelter walking around early in the morning or late in the evenings created a danger as customers pulling in and out of the nearby parking lots would have difficulty seeing them (Doc. No 26-1 at 50). Mr. Brown testified that having a homeless population that relies on walking and bicycles would be hazardous in such a highly congested area. (Doc. No. 26-1 at 57). While acknowledging that he believed "traffic would be one of the issues of public safety that may be of concern," (Doc. No. 26-1 at 26), Mr. Daecher offered evidence concerning the flow of traffic around the Shelter and stated that the traffic would be opposite to the demand for other businesses in the area. (Doc. No. 26-1 at 27-33).

The Board also heard testimony regarding the impact the proposed Shelter would have on the surrounding properties. (Doc. No. 26-1 at 37). Mr. Daecher testified that the proposed improvements that would be made to the exterior of the building could only add to the value of the neighboring properties, but he agreed that public perception indicated that the neighboring property owners were not supportive of the Shelter's presence. (Doc. No. 26-1 at 37). He summarized his view of the reality of the public's reaction as follows: "you take a poll as to whether a homeless shelter is needed in this town. Everyone will say yes until it's put in their backyard." *Id*. As with the "traffic" issues, the witnesses opposing the CUP testified regarding their concerns for property values and the safety of the area should the Shelter be permitted. Mr. Battle expressed his concerns that the Shelter would negatively impact the safety of surrounding businesses and renters and damage businesses by making their customers afraid to come to the area. (Doc. No. 26-1 at 48). Ms. Bushard testified that she was likewise concerned about her customers' safety when coming to her gym, which operates twenty-four hours a day, seven days a

5

week. (Doc. No. 26-1 at 53). Mr. Battle also provided hearsay testimony without corroboration that property owners near the Shelter's previous location reported that the Shelter's occupants regularly trespassed, begged, rummaged through nearby garbage cans, and failed to leave the area even when the Shelter was closed. (Doc. No. 26-1 at 47). Mr. Brown testified that he was concerned about trespassing on the neighboring properties and that he believed property values would be lowered by the Shelter. (Doc. No. 26-1 at 57). In response to these expressed "concerns," Mr. Daecher and Dr. Rice emphasized that no issues were reported at the Shelter's current location at the church. (Doc. No. 26-1 at 42).

After hearing testimony, the Board deliberated as to whether Plaintiff's application met the six criteria required for a conditional-use permit. (Doc. No. 26-1 at 80). The hearing took hours, but the Board's deliberations only lasted about ten minutes. (Doc. No. 35-5 at 9-11). The Board chair stated that, although 106 Elkin met all zoning requirements— which he described as "the letter of the law"—that didn't "necessarily mean it belongs there." (Doc. No. 26-1 at 89). The Board then denied the Shelter's CUP application for three alleged reasons: (1) public health and safety; (2) substantial injury to nearby property values; and (3) lack of harmony. *Id*. at 85-91. The Board made the following specific findings of fact in its written decision:

> **a. The use will not materially endanger the public health or safety if located, designed, and proposed to be operated according to the plan submitted**. *The Board found that the evidence does not support this finding as the use would endanger the public's safety as the residents of the shelter would be exiting the shelter close to the highway and the highway's right of way significantly impacts the front of property where the residents would be entering and exiting the property, often at times early in the morning and late in the evening when visibility would be an issue due to low light."*
>
> **b. The use will not substantially injure the value of adjoining property, or the use is a public necessity.** *The Board found that the evidence did not support this finding, since this use would substantially impact and decrease existing neighboring property values*.

6

**c. The location and character of the use, if developed according to the plan as submitted and approved, will be in harmony with the area in which it is to be located.** *The Board found that the evidence did not support this finding, as this use will not be in harmony with the area in which it is proposed to be located as there is a church, gym, and other retail businesses in the area and the proposed shelter was a use not in keeping with the other current uses in the area.*

(Doc. No. 26-1 at 127).

After the denial, Plaintiff filed this action on October 7, 2020 on both federal constitutional and North Carolina state law grounds. The Shelter argues that requiring a homeless shelter to obtain a CUP violates the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution and that the CUP denial violates North Carolina law governing the CUP approval process. In its Complaint, the Shelter seeks an order from this Court remanding the matter to the Board with instructions to issue the CUP or a permanent injunction ordering the Town of North Wilkesboro and Board of Adjustment to allow the Barber Shelter to operate at 106 Elkin Highway. (Compl., ¶¶1, 167). Now before the Court are the cross Motions for Summary Judgment.

## II.    LEGAL STANDARDS

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Variety Stores, Inc. v. Wal-Mart Stores, Inc.*, 888 F.3d 651, 659 (4th Cir. 2018) (quoting Fed. R. Civ. P. 56(a)); *see United States, f/u/b Modern Mosaic, LTD v. Turner Construction Co.*, *et al.*, 946 F.3d 201, 206 (4th Cir. 2019).

A factual dispute is considered genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "A fact is material if it might affect the outcome of the suit under the governing law."

*Vannoy v. Federal Reserve Bank of Richmond*, 827 F.3d 296, 300 (4th Cir. 2016) (quoting *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013)).

The party seeking summary judgment bears the initial burden of demonstrating the absence of a genuine issue of material fact through citations to the pleadings, depositions, answers to interrogatories, admissions, or affidavits in the record. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003)**.** "The burden on the moving party may be discharged by 'showing' ... an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325. Once this initial burden is met, the burden shifts to the nonmoving party. The nonmoving party "must set forth specific facts showing that there is a genuine issue for trial," *Id*. at 322 n.3. The nonmoving party may not rely upon mere allegations or denials of allegations in his pleadings to defeat a motion for summary judgment. *Id*. at 324.

In determining if summary judgment is appropriate, "courts must view the evidence in the light most favorable to the nonmoving party and refrain from weigh[ing] the evidence or mak[ing] credibility determinations." *Variety Stores,* 888 F.3d at 659 (internal quotation marks omitted) (quoting *Lee v. Town of Seaboard*, 863 F.3d 323, 327 (4th Cir. 2017)); *see Modern Mosaic* at *2. "Summary judgment cannot be granted merely because the court believes that the movant will prevail if the action is tried on the merits." *Jacobs v. N.C. Admin. Office of the Courts*, 780 F.3d 562, 568-69 (4th Cir. 2015) (quoting 10A Charles Alan Wright & Arthur R. Miller et al., Federal Practice & Procedure § 2728 (3d ed.1998)).

However, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009) (internal citations omitted). "Only disputes over facts that might affect the outcome of the

8

suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248. Also, the mere argued existence of a factual dispute does not defeat an otherwise properly supported motion. *Id*. If the evidence is merely colorable, or is not significantly probative, summary judgment is appropriate. *Id*. at 249-50.

In the end, the question posed by a summary judgment motion is whether the evidence as applied to the governing legal rules "is so one-sided that one party must prevail as a matter of law." *Id*. at 252.

## III.    DISCUSSION

### A.    *Conditional Use Permit under North Carolina Law*

Under the doctrine of "Constitutional avoidance," this Court will first look to resolve this case on the state law claim if that would render the Court's resolution of the Shelter's constitutional claims unnecessary. *See Ashwander v. Tennessee Valley Authority*, 297 U.S. 288, 347 (1936) (Brandeis, J., concurring) ("The Court will not pass upon a constitutional question although properly presented by the record, if there is also present some other ground upon which the case may be disposed of…[t]hus, if a case can be decided on either of two grounds, one involving a constitutional question, the other a question of statutory construction or general law, the Court will decide only the latter.").[1]

The Shelter argues that the Board violated North Carolina law when it denied the Shelter's Conditional Use Permit application. Well-established North Carolina law dictates a local governing board "must follow a two-step decision-making process in granting or denying an

---

[1] However, the Court will, as discussed below, decide the constitutional claim in the event that it becomes necessary for that alternate claim to be considered on appeal.

9

application for a [conditional] use permit." *Mann Media, Inc. v. Randolph Cty. Planning Bd.*, 356 N.C. 1, 12, 565 S.E.2d 9, 16 (2002). A local governmental body must first determine whether "an applicant has produced competent, material, and substantial evidence tending to establish the existence of the facts and conditions which the ordinance requires for the issuance of a [conditional] use permit." *Humble Oil & Refining Co. v. Bd. of Aldermen,* 284 N.C. 458, 468, 202 S.E.2d 129, 136 (1974). If the applicant satisfies this initial burden of production, then "*prima facie*" it is entitled to the issuance of the requested permit. *Id*. Once a *prima facie* case is established, any decision to deny the application "should be based upon findings contra which are supported by competent, material, and substantial evidence appearing in the record". *Humble Oil*, 284 N.C. at 468, 202 S.E.2d at 136. A local governmental body lacks the authority to "deny a permit on grounds not expressly stated in the ordinance" given that "it must employ specific statutory criteria which are relevant." *Woodhouse v. Bd. of Comm'rs,* 299 N.C. 211, 218-19, 261 S.E.2d 882, 887 (1980).

North Carolina General Statutes § 160D-1402 (former § 160A-393) provides that appeals of quasi-judicial decisions are subject to court review. In hearing such an appeal, the reviewing court sits in an appellate capacity:

> In reviewing the sufficiency and competency of the evidence at the appellate level, the question is not whether the evidence before the superior court supported that court's order but whether the evidence before the town board was supportive of its action. In proceedings of this nature, the superior court is not the trier of fact. Such is the function of the town board. The trial court, reviewing the decision of a town board on a conditional use permit application, sits in the position of an appellate court. The trial court does not review the sufficiency of the evidence presented to it but reviews that evidence presented to the town board.

*Coastal Ready-Mix Concrete Co. v. Bd. of Comm'rs,* 299 N.C. 620, 626-27, 265 S.E.2d 379, 383 (1980). Consequently, this Court is bound by the facts found by the decision-making board which are supported by competent, substantial evidence. *See Hillsboro Partners, LLC v. City of*

10

*Fayetteville,* 226 N.C. App. 30, 738 S.E.2d 819 (2013). The reviewing court may not make new findings of fact or conduct a *de novo* review of the evidence because it is the sole province of the decision-making board to weigh the evidence and make determinations of credibility. *Mangum v. Raleigh Bd. of Adjustment,* 196 N.C. App. 249, 260, 674 S.E.2d 379, 383 (2009). Federal courts "must accord a zoning board's fact finding the same preclusive effect to which it [would have been entitled] in the state courts when the agency acted in a judicial capacity …" *AT&T Wireless PCS, Inc. v. Winston- Salem Zoning Bd. of Adjustment*, 172 F.3d 307, 314 (4th Cir. 1999).

As an initial matter, it is undisputed that the Shelter's application satisfied the basic zoning ordinance criteria for a homeless shelter other than the CUP. The zoning ordinance requires a homeless shelter to be in the highway-business district; be at least 250 feet away from residences, parks, and schools; adjoin public sidewalks; provide supervision; have at least 50 heated square feet per client; be in harmony with the area; and obtain a conditional use permit ("CUP'). Zoning Ordinance at §§ 11.4-11, 6.7.1. The Town's planning director testified that the application "met the zoning ordinance based on the staff's review." (Doc. No. 26-1 at 16). The Board similarly agreed. *Id*. at p. 89 (Board chair stating, "it meets the letter of the law"); (Doc. No. 26-2 at 126) ("The Board found . . . the proposed use did meet all regulations and standards of the Zoning Ordinance."); *see also id*. at 90–125 (Shelter CUP application); Zoning Ordinance § 11.4-11. Therefore, the issue becomes whether the Shelter satisfied the requirements needed to clear the last hurdle, obtaining a CUP.

The CUP requirement has six criteria, which are: (1) public safety; (2) zoning compliance; (3) no substantial injury to property values; (4) area harmony; (5) water and sewer availability; and (6) conformity with the Town's general plan. Zoning Ordinance § 3.4. To establish a *prima facie* case that it has met the requirement, the Shelter must produce competent, material, and

substantial evidence in support of the criteria. *See Humble Oil & Refining Co. v. Bd. of Aldermen,* 284 N.C. at 468; Zoning Ordinance § 3.4(E)(2). The Shelter presented such evidence on all six criteria. First, on public safety, the Shelter presented: (a) the Shelter rules (including subjecting items to search and prohibiting weapons, verbal abuse, alcohol, drugs, smoking, harassment, sex offenders). (Doc. No. 26-2 at 112–13); (b) that a manager is always on duty while open. *Id.* at 16; (c) Cameras inside and outside of the building. *Id.*; (d) Planned renovations. *Id.* at 7; (e) Shelter less impacted by traffic than other uses. *Id.* at 8; and (f) Shelter operates when other businesses are closed and staffed when other businesses may not be. *Id.* at 8.

Second, on compliance with the homeless shelter ordinance, the Shelter showed the location did not require the granting of a variance. *Id.* at 9; (Doc. No. 26-1 at 26). Third, on the issue of property value, the Shelter discussed its plan to upgrade and improve the existing building and improve the landscaping. (Doc. No. 26-2 at 7-8); (Doc. No. 26-1 at 35). Fourth, on the issue of harmony, that: (a) the surrounding area is a mix of commercial and industrial properties; (b) Shelter clients are good neighbors; and (c) the proposed site is centrally located for social services, food, and employment. (Doc. No. 26-2 at 9); (Doc. No 26-1 at 9, 33, 41-42). Fifth, on water and sewer, that the Shelter had the required stormwater drainage plan. (Doc. No. 26-2 at 14); (Doc. No. 26-1 at 19:3–6). Lastly, on the sixth issue of conformity with the general plan, the Shelter showed that operating at the proposed site would conform. (Doc. No. 26-2 at 9). Consequently, having presented "competent, material, and substantial evidence tending to show that it has satisfied the applicable ordinance standard," there is a presumption the Shelter is entitled to the permit. *See PHG Asheville, LLC v. City of Asheville*, 374 N.C. 133, 158, 839 S.E.2d 755, 772 (2020).

Since the Shelter has established their *prima facie* case, the Board's decision to deny the application must be based upon findings supported by competent, material, and substantial evidence appearing in the record. *Humble Oil*, 284 N.C. at 468. Of the six CUP factors discussed above, the Board found that the Shelter failed on three of them: (1) Public Health and Safety: "[R]esidents of the shelter would be exiting the shelter close to the highway and the highway's right of way significantly impacts the front of the property where the residents would be entering and exiting." (Doc. No. 26-2 at 126); (2) Property Values: "[T]his use would substantially impact and de-crease existing neighborhood property values." *Id*; and (3) Harmony: "[T]here is a church, gym and other retail businesses in the area and the proposed shelter was a use not in keeping with the current uses." *Id.* at 126–27.

If a plaintiff contends that the local governmental body's decision was either (1) arbitrary or capricious or (2) not supported by competent, material, or substantial evidence, as is the case here, a court is required to conduct a whole record review. *Mann Media*, 356 N.C. at 13, 565 S.E.2d at 17. To do so, the Court relies only on the closed administrative record, N.C.G.S. § 160D-1403.1(d)[2], but must first strike any incompetent evidence before looking to a Board's reasoning. N.C.G.S. § 160D-1402(j) (court must invalidate "findings, inferences, conclusions, or decisions . . . [i]nconsistent with applicable procedures specified by statute or ordinance").

Under North Carolina law, the Board's hearing on the Shelter's CUP application was a quasi-judicial proceeding, which cannot "dispense with [any] essential element of a fair trial." *In re Application of Raynor*, 94 N.C. App. 173, 176 (1989) (citation omitted); *see* N.C.G.S. § 160D-406(a). One such essential element is the right to cross-examination. *Coastal Ready-Mix Concrete Co.*, 299 N.C. at 626 (essential elements of a fair quasi-judicial proceeding include "the right to

---

[2] The administrative record can be found at Doc. No. 26-1.

offer evidence, cross-examine witnesses, and inspect documents"); *Mann Media*, *Inc.,* 356 N.C. at 12 (A board "must ensure that an applicant is afforded a right to cross-examine witnesses"); David W. Owens & Adam S. Lovelady, *Quasi-Judicial Handbook: A Guide for Boards Making Development Regulation Decisions* 41 (2017) ("[P]arties have an independent right to cross-examine the witnesses).

The right to cross-examination was asserted and not waived in this case. *See Rotruck v. Guilford Cnty. Bd. of Elections*, 267 N.C. App. 260, 269 (2019). The Shelter twice asked the Board if it could cross-examine opposition witnesses and twice the Board Chair refused. The first denial occurred at the outset before witnesses were called:

> Mr. Daecher: If there are other sworn witnesses [who I have not called], I believe I should have -- and I'm asking if I have the right to cross-examine anyone -- what the witness has to say.
> Board Chair: You cannot --
> Town Attorney: The Board has to.
> Board Chair: The Board can cross-examine the witnesses as you --
> Town Attorney: Because this is a quasi-judicial hearing.
> Mr. Daecher: So only the Board can but not -- not the applicant of the party --
> Town Attorney: That's correct.

(Doc. No. 26-1 at 24-25); (Doc. No. 26-2 at 117). After the first opposition witness testified against the Shelter recounting rumors of "beer cans, whiskey bottles, [and] syringes" at the Shelter's old location, (Doc. No. 26-1 at 50), Mr. Daecher asked again to cross examine the opposition witnesses. But, again, the Board said no:

> Board Chair: [addressing Board] Does anyone have any questions for Mr. Battle?
> Mr. Daecher: Does that include me? . . . It doesn't include me, right?
> . . .
> Board Chair: No, no. He didn't --
> . . .
> Town Attorney: No. [Indiscernible] let this turn into a necessarily as a quasi-judicial hearing if we're going to have basically what turns into basically arguments. I don't think that that would be a proper way to [indiscernible].
> Board Chair: Right.

14

> Mr. Daecher: I wouldn't want to have arguments. But my question -- I'm not allowed to ask someone else?
>
> Board Chair: [Does not respond and calls next witness].

*Id.* at 56-57. These two denials of the Shelter's right to cross-examine are clear legal errors. *See Coastal Ready-Mix*, 299 N.C. at 626 ("[i]nsuring that appropriate due process rights of a petitioner [were] protected, including the right to . . . cross-examine witnesses"); *Quasi-Judicial Handbook* 41 ("The Board itself provides a level of cross examination of witnesses through its questioning, but parties have an independent right to cross-examine the witnesses.").

The Board contends that the Board chair may have been concerned with a potential outbreak of an argument between the Shelter board members and those testifying in opposition to CUP.[3] While there is no way to know if the Board's speculation about a disturbance in the hearing was well-founded[4], the Shelter's legal rights do not vanish like Amelia Earhart [5] because of the mere possibility of unpleasantness.

The Board asks the Court to ignore this clear error in denying the Shelter the ability to cross-examine neighboring property owners, arguing that the error was harmless and did not affect the outcome of the proceeding. Under North Carolina law, a plaintiff must not only show error, but it must show that the error affected the outcome of the proceeding. *See Perry v. Southern Surety Co.*, 190 N.C. 284, 292, 129 S.E. 721, 725 (1925) (a judgment will be affirmed "if upon the entire record, no substantial right to the appellant has been denied, and even if irregular, when the correct result is accomplished"). However, it strains credibility to suggest the inability to cross-examine

---

[3] *See* Transcript of Motion Hearing, 5:20-cv-163 (December 2, 2021).

[4] A review of the hearing transcript suggests that the Shelter advocates and opponents both behaved appropriately.

[5] *See* Olivia B. Waxman *Amelia Earhart Was Declared Dead 80 Years Ago. Here's What to Know About What Actually Happened to Her*, Jan. 4, 2019, https://time.com/5486999/amelia-earhart-disappearance-theories.

was harmless and did not affect the outcome of the proceeding. Much of the testimony provided by neighboring property owners dealt with alleged past conduct by Shelter clients at other locations.[6] Who better than the Shelter to help the Board through cross examination determine the veracity of these claims? The Shelter strongly disputes the testimony based on personal knowledge of the alleged incidents. (Doc. No. 35-19). Therefore, the Board's refusal to allow the Shelter to challenge the hearsay testimony of these witnesses through cross-examine was clearly prejudicial to the Shelter. Further, it is contradictory for the Board to rely on the testimony of the neighboring property owners extensively and then argue that the legal error concerning the testimony was harmless. [7,8]

The remedy for this prejudicial legal error is set by North Carolina law. As the Supreme Court of North Carolina explained, un-crossed testimony is incompetent and inadmissible. *Citizens Bank & Trust Co. v. Reid Motor Co*, 5 S.E. 2d 318, 320 (1939). Therefore, this Court must exclude all that incompetent evidence here.[9] *See, e.g.*, *PHG Asheville*, 374 N.C. at 157-158 (excluding incompetent evidence and concluding that CUP should have been granted based on remaining evidence). Therefore, none of the opposition witness testimony can be considered when this Court evaluates the Board's reasoning for denying the CUP.

Now, the Court will proceed to evaluate the Board's reasoning based on any remaining competent evidence.

---

[6] *See* John Battle, Doc. No. 26-1 46:3–51:10, Yvette Bushard, *id.* at 52:25–55:2, John Brown, *id.* at 55:4–59:25, and Scott Nafe, *id.* at 60:3–65:21.

[7] Defendant's briefing relies on the testimony to defend each part of the Board's decision: public health and safety (citing Battle (Doc. No. 33 at 22)), property values (citing Battle, Bushard, and Nafe, (Doc. No. 33 at. 22–23)), and harmony ("adjoining property owners rebutted the presumption" of harmony, (Doc. No. 33 at. 23)).

[8] *See* Transcript of Motion Hearing, 5:20-cv-163 (December 2, 2021).

[9] The excluded evidence is the testimony of: John Battle, Doc. No. 26-1 46:3–51:10, Yvette Bushard, *id.* at 52:25–55:2, John Brown, *id.* at 55:4–59:25, and Scott Nafe, *id.* at 60:3–65:21.

16

1.    Property Value: The use of the property would substantially injure the value of adjoining property

The Board found that the Shelter "would substantially impact and decrease neighboring property values." (Doc. No. 26-1 at 127). The Shelter contends that there is no competent evidence to support such a finding. Competent evidence about how a "use of property . . . affects the value of other property" may not consist of "the opinion testimony of lay witnesses." N.C.G.S. § 160D-1402(j)(3). Therefore, there must be some evidence other than lay witness testimony to support this finding. There was none.

 The Town claims that there was expert testimony regarding property values. Scott Nafe, a commercial real estate appraiser and a neighboring property owner testified that the Shelter would have a negative impact on surrounding property values. (Doc. No. 36 at 18). The Town asserts Mr. Nafe based his opinion on incidents of criminal activity at the Shelter's previous location, which included trespass, indecent exposure, larceny, and assault. According to the Town, Mr. Nafe's concerns were reflected by other property owners who also spoke in opposition to the Shelter. *Id*. Additionally, each person who testified against the Shelter spoke about negative impacts that would occur to their respective properties. *Id*. Thus, the Town argues that the testimony of neighboring property owners about the negative impacts they would encounter due to the Shelter and the burdens that would be placed on their properties and businesses provided the Board with sufficient evidence to find that granting the CUP would harm neighboring properties and decrease property values in the area. *Id*.

However, as noted above, all the un-crossed witness testimony of neighboring property owners, including Mr. Nafe, is incompetent evidence and cannot be considered by this Court. Moreover, even if it was to be considered, Mr. Nafe was testifying as a neighboring property owner

and not as an expert. Mr. Nafe provided no analysis of data, statistics, comparative properties, comparative assessments, or pricing trends to support his opinion. Therefore, there is no competent evidence to find the Shelter will substantially injure neighboring property values.[10]

    2.    <u>Harmony: The use of the property would not be in harmony with the area.</u>

While there is no exact definition of harmony under North Carolina law, the Board defined it generally as compatibility with the uses surrounding it. (Doc. No. 33-4 p 28). This was done by looking at "the type of business, operating hours, functions, and the traffic the business will generate." (Doc. No. 36-8 at 3). The Board denied the Shelter's CUP application because it determined that the Shelter wouldn't be harmonious with "a church, gym and other retail businesses in the area." (Doc. No. 26-1 at 126–27). The Shelter argues that this ruling is arbitrary and capricious because it effectively bars the Shelter from operating anywhere in the town. Of the 34 parcels in North Wilkesboro where a shelter could hypothetically exist under the zoning ordinance (i.e., in the highway-business district, with sidewalks, and far enough away from homes, schools, and parks), *all* are near retail. (Doc. No. 35-21). When asked where a homeless shelter would be harmonious, the Board stated near "businesses that would provide services for the homeless population, or for just population in general. I think certainly businesses that provide amenities that they might need. Transportation, mental health, employment services, educational services." (Doc. No. 36-8 at 3). There is no evidence this hypothetical location exists in North Wilkesboro.

---

[10] The Shelter also argues that it is a public necessity and therefore exempt from the property-value requirement. (Doc. No. 35 at 24). While there well may be merit in this argument, the Court need not reach this issue as there is no competent evidence to support a finding that the Shelter will substantially injure adjoining property value.

Inclusion of a particular use in a zoning ordinance creates a presumption that the use is compatible with a surrounding area, but this presumption can be rebutted. *See Hopkins v. Nash County,* 149 N.C. App. 446, 450, 560 S.E.2d 592, 595 (2002). The Board argues that the presumption has been rebutted based, again, on the testimony of adjoining property owners who testified on the burdens that would be imposed upon their properties. (Doc. No. 33 at 23). As discussed above, this evidence is incompetent and cannot be considered by this Court. Having struck the incompetent testimony, there is no evidence to support a finding that the Shelter would not be harmonious. The Shelter meets all the requirements of the zoning ordinance's definition of harmony [11] and the Board seeks to deny the CUP on a basis that effectively operates as a complete bar to the Shelter existing anywhere. In sum, an analysis that is incapable in all circumstances of resulting in a favorable ruling for the Shelter cannot satisfy the Board's burden to provide substantial competent evidence in support of its position and is therefore arbitrary and capricious.

3.  Public Health and Safety: The proposed use of the property would endanger public health or safety if located, designed, and proposed to be operated according to the Shelter's plans.

The Board concluded that the proposed use of the property would create a danger to public health and safety due to the location and the Shelter's rules and hours of operations. According to the Board, the proposed location adjoins one of the busiest commercial intersections in North Wilkesboro. (Doc. No. 26-1 at 49). The Board says that it determined that the location was, in its

---

[11] The homeless-shelter ordinance specifies two requirements bearing on harmony. First, that a homeless shelter must be in the highway-business district, and that it must be certain linear distances from residential, school, and park uses. *See* Zoning Ordinance §§ 6.7, 11.4-11. The highway-business district allows dozens of business, institutional, and residential uses along the major thoroughfares. *See* Zoning Ordinance § 6.7. The stated purpose of the highway district is "to serve the town as compact and efficient retail shopping, consumer services and wholesaling areas along designated highways and thoroughfares." Zoning Ordinance § 6.4(H).

19

opinion, dangerously close to the highway / intersection because the Shelter requires its clients to leave the property at 6:30 a.m. each day. *Id.* at 86. Board members inspected the exterior of the property during a site visit prior to the hearing. *Id.* at 7.

While it is well settled that a board may consider facts from their own investigation, here, the Board's reasoning folds under even minimal scrutiny. *See PHG Asheville, LLC v. City of Asheville*, 374 N.C. 133, 156, 839 S.E.2d 755, 770 (2020) (a local board is allowed and may consider facts acquired by personal inspection of premises in the locality in which the board serves). The Board ruled against the Shelter on safety grounds because "residents would be exiting the shelter close to the highway"; however, the Zoning Ordinance *requires* a homeless shelter to be in the "highway business" district, which, by definition, consists of "areas along designated highways and thoroughfares." Zoning Ordinance § 6.4(H), § 6.7 (table of uses). Moreover, the Shelter would likely decrease traffic as opposed to increasing it. Mr. Daecher, a Shelter board member, and traffic engineer by trade [12], opined that homeless shelters are the lowest generator of traffic one could find for general retail and office property in the highway business district. (Doc. No. 26-1 at 27). Mr. Daecher bluntly stated, "No other use will give you less traffic than this." *Id.*

Related to this "proximity to highway" consideration, the Board also expressed concern about a potential right-of-way issue. A Board member noted that "the state . . . could come in and do anything they want to do with" the right-of-way and that this could lead to the Shelter posing a greater threat to public safety. However, it was admitted there was no evidence of state plans to

---

[12] Mr. Daecher testified he has appeared as a witness in over 1,000 zoning hearings and court hearings on similar traffic concerns. (Doc. No. 26-1 at 27).

expand the right-of-way and the Board member further acknowledged "the state probably won't" do anything. (Doc. No. 26-1 at 86).

The Board also stated that the right of way "significantly impacts the front of the property" because people would come and go "early in the morning and late in the evening when visibility would be an issue." (Doc. No 26-2 at 126). This is another feeble argument. Of course, people come and go in the highway-business district at all hours. Indeed, there is a 24-hour gym open every day *across the street* from the Shelter's proposed location at 201 Elkin. (Doc. No. 26-1 at 58). Furthermore, a Board member feared that the residents "can all slip right into the main street." (Doc. No. 26-1 at 86). However, the reason the ordinance requires sidewalks is precisely so people can come and go safely without impeding traffic. Zoning Ordinance § 11.4-11. And "Catch-22"[13] applies here as well: The Board in fact denied the Shelter's 2019 CUP application for another location because the proposed location didn't have sidewalks. (Doc. No. 26-1 at 25). Denying a zoning request both because a property does and does not have sidewalks close to the highway is, of course, paradoxical. Thus, in criticizing the Shelter for selecting a location with sidewalks near the highway the Board not only deviates from the stated requirements in the zoning ordinance but seems to flatly contradict them. However, a board is bound to "exclusive reliance upon the substantive standards enunciated in the relevant provisions of its land use ordinance in determining whether conditional use permit applications should be granted or denied." See *PHG Asheville*, 374 N.C. at 158. To do otherwise, as the Board has done here, is arbitrary and capricious.

Moreover, there are 128 uses that could exist at 106 Elkin without a CUP, requiring just a permit that Town staff must issue if the use meets the zoning requirements and these alleged

---

[13] *See* Joseph Heller, *Catch-22* (1961) (A catch-22 is a paradoxical situation from which an individual cannot escape because of contradictory rules or limitations).

"sidewalk and traffic safety issues" would affect any of the uses involving pedestrian access to the building equally. *See generally* Zoning Ordinance § 6.7 (table of uses). Consequently, the Board's finding on public safety is unreasonable and arbitrary and capricious.

In sum, the Court finds that the Board's denial of the CUP violated North Carolina law. The Board failed to rebut the presumption of entitlement to a CUP, which the Shelter properly established. There is no competent evidence to support the Board's findings on "harmony" and "property values," and its reasoning in regard to public safety, to the extent it is even competently supported by the Board's lone site visit and speculations, is manifestly paradoxical, unreasonable, and arbitrary. Therefore, this Court is required to reverse the Board's denial and remand with instructions to issue the CUP.

        B.       *Violation of The Equal Protection Clause of the Fourteenth Amendment*

The Fourteenth Amendment of the United States Constitution, ratified in 1868, reads "[n]o State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. Senator Jacob M. Howard, when introducing the Fourteenth Amendment for debate in the thirty-nineth Congress, stated the Equal Protection Clause "abolishes all class legislation in the States and does away with the injustice of subjecting one caste of persons to a code not applicable to another." [14] Justice John Marshall Harlan in his famous *Plessy v Ferguson* dissent similarly declared, "[i]n view of the Constitution, in the eye of the law, there is in this country no superior, dominant, ruling class of citizens. There is no caste here. Our constitution is color-blind, and neither knows nor tolerates classes among citizens. In respect of

---

[14] CONG. GLOBE, 39th Cong., 1st Sess. 2766 (1866) (statement of Sen. Howard).

22

civil rights, all citizens are equal before the law. The humblest is the peer of the most powerful."

*Plessy v. Ferguson*, 163 U.S. 537, 559 (1896) (Harlan, J., dissenting).

Consequently, the Equal Protection Clause has characteristically been concerned with governmental classifications that treat individuals differently than others. *Engquist v. Or. Dep't of Agric.*, 553 U.S. 591, 601, 128 S. Ct. 2146, 2152 (2008); *Ross v. Moffitt*, 417 U.S. 600, 609, 94 S. Ct. 2437, 41 L. Ed. 2d 341 (1974) ("'Equal Protection . . . emphasizes disparity in treatment by a State between classes of individuals whose situations are arguably indistinguishable"). While a state government may not arbitrarily treat people within its jurisdiction differently, it is well recognized that this proposition "must coexist with the practical necessity that most legislation classifies for one purpose or another, with resulting disadvantage to various groups or persons." *Romer v. Evans*, 517 U.S. 620, 631 (1996).

In recognition of the practical necessity of some classification, courts employ different levels of scrutiny for different types of classifications. Although the Constitution does not prescribe tiers of scrutiny, the Supreme Court has used them as an analytical guide in First and Fourteenth Amendment cases since the mid-twentieth century.[15] While the constitutional foundation of these tiers has been questioned, they are binding on this Court nevertheless.[16] There are three levels of scrutiny, of which two apply in the context of the Fourteenth Amendment. First, there is strict scrutiny. Strict scrutiny asks whether a law is narrowly tailored to a compelling

---

[15] Brief for J. Joel Alicea as Amicus Curiae in Support of Petitioners, *New York State Rifle & Pistol Association, Inc. v. Bruen*, No. 20-843, p. 8 (Nov. 3, 2021).

[16] *Whole Woman's Health v. Hellerstedt*, 579 U.S. ___, 136 S. Ct. 2292, 2327 (2016) (Thomas, J., dissenting) (citing *United States* v. *Virginia*, 518 U. S. 515, 570 (1996) (Scalia, J., dissenting) ("The illegitimacy of using 'made-up tests' to 'displace longstanding national traditions as the primary determinant of what the Constitution means has long been apparent)). *See generally* Brief for J. Joel Alicea as Amicus Curiae in Support of Petitioners, *New York State Rifle & Pistol Association, Inc. v. Bruen*, No. 20-843(Nov. 3, 2021).

government interest. *Citizens United v. FEC,* 558 U.S. 310, 340, 130 S.Ct. 876, 898, 175 L.Ed.2d 753, 782 (2010). In the Fourteenth Amendment context, if a classification discriminates on race, national origin, or alienage, collectively known as suspect classifications, a court will apply strict scrutiny. *San Antonio Indep. Sch. Dist. v. Rodriguez,* 411 U.S. 1, 61, 93 S. Ct. 1278, 1311 (1973)*; See Loving v. Virginia*, 388 U.S. 1, 11, 87 S.Ct. 1817, 1823, 18 L.Ed.2d 1010 (1967). The same is true when the classification involves a fundamental right. *Clark v. Jeter*, 486 U.S. 456, 461, 108 S. Ct. 1910, 1914, 100 L. Ed. 2d 465 (1988). But if a case does not involve a suspect classification or a fundamental right, under Fourteenth Amendment case law rational basis scrutiny will be employed. *Id.*

The general rule under rational basis scrutiny is that legislation is presumed to be valid and will be upheld if the classification is rationally related to a legitimate state interest. *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 440, 105 S. Ct. 3249, 3254, 87 L. Ed. 2d 313 (1985); *Schweiker v. Wilson,* 450 U.S. 221, 230, 101 S.Ct. 1074, 1080, 67 L.Ed.2d 186 (1981); *United States Railroad Retirement Board v. Fritz,* 449 U.S. 166, 174-175, 101 S.Ct. 453, 459-460, 66 L.Ed.2d 368 (1980); *Vance v. Bradley,* 440 U.S. 93, 97, 99 S.Ct. 939, 942, 59 L.Ed.2d 171 (1979); *New Orleans v. Dukes,* 427 U.S. 297, 303, 96 S.Ct. 2513, 2516, 49 L.Ed.2d 511 (1976). In the present case, the Shelter does not allege that the Town either burdened a fundamental right or employed a suspect classification. Thus, this Court must apply the rational basis standard to review the Town's actions under the Equal Protection Clause. *Tri Cty. Paving, Inc. v. Ashe Cty*., 281 F.3d 430, 438–39 (4th Cir. 2002).

The Shelter maintains that the CUP requirement is both facially unconstitutional and unconstitutional as applied to it. The Supreme Court has long disfavored facial challenges for several reasons. *See Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 450, 128

S. Ct. 1184, 1191 (2008). They raise the risk of "premature interpretation of statutes on the basis of factually barebones records." *Sabri v. United States*, 541 U.S. 600, 609, 124 S. Ct. 1941, 158 L. Ed. 2d 891 (2004). Facial challenges also conflict with the principle of judicial restraint. Courts should not "'anticipate a question of constitutional law in advance of the necessity of deciding it'" or "'formulate a rule of constitutional law broader than is required by the precise facts to which it is to be applied.'" *Ashwander v. TVA*, 297 U.S. 288, 346–347, 56 S. Ct. 466, 80 L. Ed. 688 (1936) (Brandeis, J., concurring) (quoting *Liverpool, New York & Philadelphia S. S. Co. v. Commissioners of Emigration*, 113 U.S. 33, 39, 5 S. Ct. 352, 28 L. Ed. 899 (1885)). Therefore, the Court will address the Plaintiff's as applied challenge to the CUP requirement and only move to the facial challenge if it is necessary.

To succeed on its Equal Protection claim, a plaintiff must demonstrate that he has been treated differently from others with whom he is similarly situated, and that the unequal treatment was the result of intentional or purposeful discrimination. Once this showing is made, a court must determine whether the disparity in treatment can be justified under the requisite level of scrutiny, here rational basis. *See e.g., City of Cleburne*, 473 U.S. at 439-40; *Mickle v. Moore*, 528 U.S. 874, 145 L. Ed. 2d 151, 120 S. Ct. 179 (1999); *In re Long Term Admin. Segregation of Inmates Designated as Five Percenters*, 174 F.3d 464, 471 (4th Cir.), *cert. denied*; *Sylvia Dev. Corp. v. Calvert County*, 48 F.3d 810, 818-19 (4th Cir. 1995). The Supreme Court has also recognized successful equal protection claims brought by a "class of one," where a plaintiff alleges that he has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment. *See Sioux City Bridge Co. v. Dakota County*, 260 U.S. 441, 43 S.Ct. 190, 67 L.Ed. 340 (1923); *Allegheny Pittsburgh Coal Co. v. Commission of Webster Cty*., 488 U.S. 336, 109 S.Ct. 633, 102 L.Ed.2d 688 (1989). The Supreme Court long ago concluded

"'[t]he purpose of the equal protection clause of the Fourteenth Amendment is to secure every person within the State's jurisdiction against intentional and arbitrary discrimination, whether occasioned by express terms of a statute or by its improper execution through duly constituted agents.'" *Sunday Lake Iron Co. v. Township of Wakefield*, 247 U.S. 350, 352, 38 S.Ct. 495, 62 L.Ed. 1154 (1918)).

The Shelter argues it is being treated differently than "similarly situated" businesses and uses. The Shelter notes that North Wilkesboro does not require a CUP in the highway-business district for: "hospitals," "nursing care institution[s]" (for the "chronically ill or incurable"), "congregate care facilities" (for the elderly), "civic, fraternal, cultural, and community facilities", "emergency shelters", "lodges" or 124 other specified uses. The Shelter contends not only is it similarly situated to these land uses that do not require a CUP but also that it is not like the other uses that require a CUP in the highway-business district. The other uses required to obtain a CUP are a car lot, race way, waste transfer station, cell-phone tower, nightclub, and bed-and-breakfast. Zoning Ordinance § 6.7. All are commercial uses and raise distinct issues such as excess traffic, excess noise at night, and/or visual pollution, which the Shelter does not.

The Town argues that there are meaningful differences between the Shelter and the uses it cites as similar. A congregate care facility, hospital, group care facility, and a nursing care institution must be licensed by the state, and all four provide medical services. (Doc. No. 36); Zoning Ordinance §5.3. [17] In contrast to these uses, a homeless shelter provides no continuous

---

[17] A congregate care facility is defined as a "multi-unit facility" that offers medical care, recreational facilities, and "significant social facilities to meet the needs of the elderly." Ordinance §5.3. A hospital as per the Ordinance provides "medical, psychiatric, or surgical services for sick or injured persons." *Id*. A group care facility provides rehabilitation services, therapy, and counseling for more than twenty individuals. *Id*. And, a nursing care institution is "a licensed healthcare facility" that provides "planned and continued medical or nursing attention." *Id*.

medical or nursing care, offers no psychiatric or surgical services, recreational facilities, therapy, counseling, or other rehabilitative services. (Doc. No. 33 at 17). Nor is the Shelter required to be licensed. *Id*. The Town also claims the Shelter is not materially similar to a childcare institution in that it provides shelter to adults, and is not limited to, or even directed towards providing care to children. (Doc. No. 33 at 18-19). The Town further maintains the Shelter has provided no evidence to show that it is equipped to care for handicapped children or provide for the "emotional, educational, spiritual, and other special needs" of the children who use the Shelter. Finally, the Town argues that an emergency shelter, which is "a facility providing temporary housing for one or more individuals who are temporarily or permanently homeless due to disaster, evacuation or other similar civil emergency," is not materially similar to a homeless shelter. *Id*. at 19. According to the Board, the very essence of an emergency shelter is that it is by nature temporary, and arises "due to disaster, evacuation, or other similar civil emergency." Zoning Ordinance §5.3. In contrast, the Town argues the Shelter operates on a permanent basis, regardless of whether an emergency exists or not. In sum, the Town contends the only similarity is the overnight nature of the various uses.

The fact that there are some differences between the Shelter and these other uses does not, however, end the analysis. The similarly situated analysis is not a search for identical uses but a search for uses that are alike for "all relevant purposes." *Williams v. Vermont*, 472 U.S. 14, 23–24 (1985). Simply put, they must be comparable with respect to the legislative aim. *Id.*; *see also* Giovanna Shay, *Similarly Situated*, 18 Geo. Mason L. Rev. 581, 617 (2011). As the Town admits, the reason for requiring a CUP is the intensity of the land use and the potential impact upon adjoining property owners. (Doc. No. 35-24 at 201). Therefore, the proper inquiry is not whether there are some facts that differentiate a homeless shelter from these other uses, but it is whether

there are facts *pertaining to the intensity of the land use and the potential impact upon adjoining property owners that* differentiate the Shelter. The answer is no.

The Town, whether in its written filings or oral representations, has failed to show facts that would lead this Court to conclude the Shelter's land use is not like a number of other uses cited for all relevant purposes. Take for example the Town's argument that some of the uses are required to obtain a license to operate by the state. A congregate care facility, hospital, group care facility, and a nursing care institution offer care to those who need assistance but unlike the Shelter, are licensed by the state. This requirement certainly makes these uses "different" from the Shelter, but the difference has nothing to do with the intensity of the land use. A use is no more or less intense because it had to go through an administrative process of obtaining a license. Another instructive example is a lodge. The zoning ordinance defines a lodge as a "building or land used for the activities of a nonprofit private club or social organization and not adjacent to, operated as, or in connection with a public tavern, cafe, or other place open to the public." Zoning Ordinance §5.3. The Town represented at the hearing on this motion the definition was based on the lodge being a business offering overnight accommodations to its employees and other individuals who may be coming to those business premises for training but not otherwise open to the public. How does one's employment status affect the intensity of the land use of an overnight accommodation facility? The answer is, of course, that it doesn't.

Possibly the most striking example of the discrimination against the Shelter is when it is compared to an emergency shelter. An emergency shelter is defined as a "facility providing temporary housing for one or more individuals who are temporarily or permanently homeless due to disaster, evacuation or other similar civil emergency" and a homeless shelter is defined as a "short- or long-term shelter for persons who lack a fixed, regular and adequate nighttime

28

residence." Zoning Ordinance §5.3. The only difference in the definitions is that an "emergency shelter" states the reasons why one might be homeless, and the definition of a "homeless shelter" does not. The reason for why a use is operating has no bearing on the intensity of the land use. The Town's argument that they are different because the very essence of an emergency shelter is that it is by nature temporary, and arises "due to disaster, evacuation, or other similar civil emergency" is wholly unpersuasive. Nowhere in the definition of an emergency shelter does it state any limit on the amount of time that it might be open (the effect of a disaster on a community could unfortunately last months or even years) nor even require that it operate on a temporary basis at all. Thus, the lack of any discernable difference in the intensity of the land use, or any meaningful difference for that matter, between an emergency shelter and a homeless shelter leads to the inescapable conclusion that the Shelter is similarly situated to an emergency shelter.

In *Cleburne*, the Supreme Court held that a home for the intellectually disabled was similarly situated to:

> apartment houses, multiple dwellings, boarding and lodging houses, fraternity or sorority houses, dormitories, apartment hotels, hospitals, sanitariums, nursing homes for the convalescents or the aged (other than for the insane or feebleminded or alcoholics or drug addicts), private clubs or fraternal orders, and other specialized uses.

473 U.S. at 447. Similarly, here, while there are no other uses identical to a homeless shelter, there are many as discussed above that are alike for "all relevant purposes" that do not require a CUP. Therefore, the Shelter has met its initial burden of showing it is being intentionally treated differently than similarly situated uses.

Having satisfied its threshold burden, the Shelter must show that the disparity in treatment cannot be justified under rational basis review. *See Cleburne Living Ctr.*, 473 U.S. at 440 (The

zoning ordinance is presumed to be valid and will be upheld if the discrimination is rationally related to a legitimate state interest.). As discussed above in connection with the state law analysis, the Board relied on several factors in denying the CUP as to the Shelter: significant public opposition, traffic and safety concerns, and the lack of harmony with surrounding businesses. (Doc. No. 33 at 15). While all of these in theory could provide a rational basis for denying a CUP, as applied to the Shelter each fails.

First, as was in the case in *Cleburne*, the Board was very concerned with the opposing views of the neighboring property owners. Public concern is certainly a valid interest for a Board to consider but as the Court in *Cleburne* noted "mere negative attitudes, or fear, unsubstantiated by factors which are properly cognizable in a zoning proceeding, are not permissible bases" to treat one group differently than another similarly situated one. *Cleburne Living Ctr.*, 473 U.S. at 448. In other words, a constituency cannot order a city to violate the Equal Protection Clause. *Lucas v. Forty-Fourth General Assembly of Colorado*, 377 U.S. 713, 736-737 (1964); *Palmore v. Sidoti*, 466 U.S. 429, 433 (1984). The Shelter persuasively argues that the testimony of neighboring property owners are unsubstantiated fears and thus an impermissible basis for denial of the CUP.

Neighbor John Battle reported past "stories" of former Shelter neighbors finding "beer cans, whiskey bottles, syringes, old clothes, human feces and similar stuff all over their property and parking lots. They have reported having the homeless regularly trespassing on their property to include sleeping, hanging out, begging for money, begging for food, rummaging through personal properties in garbage cans and causing endless trash pickup" and professed to not wanting "women and children to have to deal with drug paraphernalia, trash, or inappropriate items" (Doc. No. 26-1 at 50-52). Yvette Bushard argued that the area would cease to be a "safe place for our young people and older people to work out," because her gym is in "a warehouse area [with]

corridors, and alleys, and stuff that normally the public doesn't go but would be a good place for [the homeless] to get out of public view" *Id*. at 58. Another businessowner, Scott Nafe, told a story about "indecent exposure" at the Shelter's prior location. *Id*. at 68. Board Member Church foresaw that "you'll have people out rolling just roaming around different areas and all." *Id*. at 88.

The Shelter strongly objects to the assertions made by the witnesses. The Shelter asked multiple times at the hearing to cross examine these witnesses but was denied in violation of North Carolina law. *See supra* p 13-16. This fact makes the Court extremely skeptical of the neighboring property owner's uncontested hearsay testimony. In contrast, Dr. Rice, the pastor at the church where the Barber Shelter is currently located, testified from personal knowledge that he had received no complaints from neighbors about the Shelter, saw no noticeable increase in trash outside the church, had experienced no loitering, and had heard no issues from other tenants at the church. Derek Wyatt, a night manager at the shelter, stated in his declaration that he was present at or had knowledge of many of the hearsay incidents mentioned at the hearing and denied the property owners' version of events.[18] North Wilkesboro cannot deny a CUP to the Shelter because

---

[18] "I have never witnessed or heard about a situation where a client physically harmed another person." Declaration of Derek Wyatt ("Wyatt Decl.") ¶ 14; "At the hearing, someone mentioned a police report involving indecent exposure at the Barber Shelter. I was at the Barber Shelter when the call to law enforcement was made. Shortly before calling 911, the caller stated, within my earshot, that she was unhappy with the night manager from the previous night for enforcing the rules about alcohol, and she then said she would make sure he lost his job. I told law enforcement about this during their investigation, and they did not pursue any charges against the night manager. I'm not aware of a single incident of indecent exposure at the Barber Shelter." ¶ 18; "At the conditional-use-permit hearing, people also said that, at the Barber Shelter's previous location at 86 Sparta Road, its clients littered neighboring yards with trash, drug paraphernalia, and other items. But I had not heard these types of complaints from our neighbors before the hearing. I have also never seen our clients litter or otherwise disturb neighbors' property. Based on my experience with the clients and neighbors, I have no reason to believe that these rumors about littering are true. And even if there were littering, there is no reason to believe the Barber Shelter's clients were the cause. We provide enough trash and recycling facilities to meet our needs, and we ensure that our property is clean." ¶ 19.

of unsubstantiated fears of misconduct by homeless individuals that may or may not have happened by people who may or not ever stay at the Shelter again. Plainly, the witnesses and Board members dealt in rumors and fear, not facts. "Private biases may be outside the reach of the law, but the law cannot, directly or indirectly, give them effect." *Sidoti*, 466 U.S. at 433. For this Court to allow the Town to do so would clearly violate the text and spirit of the Equal Protection Clause as well as binding Supreme Court precedent. *See Cleburne Living Ctr.*, 473 U.S. at 448.

The Board also expressed traffic and safety and harmony concerns about the Shelter operating at the proposed location. But as the Court in *Cleburne* reasoned, when discussing a safety issue (which in *Cleburne* was the possibility of a flood), a Board's decision needs to be "based on a distinction" between the proposed use and other permitted similarly situated uses. *See Cleburne Living Ctr.*, 473 U.S. at 449. Consequently, when looking at the safety and harmony rationales it is not enough that in the abstract the reasoning be rational. Instead, the rationale must be based on a distinction between the Shelter and other uses.

The Board apparently believes – incorrectly – that it can say the magic words "traffic and safety" and this Court will rubber stamp the classification no matter the facts. Rather, the Board must establish that its safety concerns are based on an actual material distinction between a homeless shelter and the similarly situated uses that do not require a CUP. (Doc. No. 36 at 12). In support of its position, the Board points to 1) the Shelter's plans to operate during evening and night hours that run directly opposite to ordinary business hours, and primarily at a time when it will be dark (Doc. No. 35 at 9); 2) the property's proximity to the highway given that the Shelter's clientele are primarily pedestrians who would be coming and going at night, and; 3) unlike most of the clientele for the other uses, the Shelter's clientele would be almost exclusively pedestrians. (Doc. No. 33-4 at 80, 84- 85). The purported concern about the hours of operation is immediately

undermined by the fact that there is a 24-hour gym open every day across the street from the Shelter's proposed location at 201 Elkin that does not require a CUP. (Doc. No. 26-1 at 58). Indeed, the gym presumably has numerous customers coming and going at hours other than ordinary business hours, i.e., early evening after work and early morning before work. There is no reason to believe that it is more dangerous to enter and exist a shelter than a gym in the "dark".[19]

Additionally, there is no limit or requirement on other similarly situated uses pertaining to their hours of operation. For example, an emergency shelter or a medical care facility can and likely will operate early in the morning and late at night. Consequently, while a concern about operating during darkness can, in some circumstances, be legitimate, it does not meaningfully distinguish the Shelter from the other permitted uses and thus it is irrational as applied to the Shelter alone.

Second, the Board's alleged concerns about the Shelter's proximity to the highway and the safety of pedestrians fare no better and, in fact, run counter to the Zoning requirements. The Shelter is required to be in the highway district and have sidewalks to protect pedestrians. *See* Zoning Ordinance §§ 6.7, 11.4-11. Thus, every use within the highway district would have the same issue of proximity to the highway. This limits the Court's focus to the issue of pedestrians. While it is certainly true that many of the Shelter's clientele arrive on foot, it does not follow this creates a rational safety concern.

---

[19] It is undisputed the Shelter operates from 6:30 pm to 6:30 am. (Doc. No. 26-1 at 86). The Town contends during these times it is dark and therefore dangerous. However, for much of the year in North Carolina it isn't even dark at 6:30pm. From March 14, 2021 to October 29, 2021 sunset was after 6:30pm. *See North Wilkesboro, North Carolina, USA — Sunrise, Sunset, and Daylength*, Timeanddate.com, https://www.timeanddate.com/sun/@4482577 (Dec. 13, 2021).

Lastly, the Board relied on concerns that the Shelter would not be in harmony with the surrounding properties. As noted above, because there is no definition of harmony under North Carolina law, the Board looks at "the type of business, operating hours, functions, and the traffic the business will generate." The Board denied the Shelter's CUP application because it determined that the Shelter wouldn't be harmonious with "a church, gym and other retail businesses in the area." (Doc. No. 26-2 at 126). However, when taken together with the other zoning requirements, if the Shelter cannot be near "a church, gym and other retail businesses in the area" it cannot be anywhere in the highway district where it is required to locate.[20] [21] To show the irrationality of this harmony ruling one need only look at the "retail" uses the Board claims are harmonious with the Shelter. When asked with what businesses the Shelter could be in harmony, the Board stated, "businesses offering services to benefit the homeless population, or for the population in general, such as transportation, mental health, employment, and educational services." (Doc. No. 36-8 at 3). But there is a problem with these examples – none of them are "retail" as defined by the Town's zoning ordinance. *See* Zoning Ordinance § 6.7 (Table of Uses: "transportation" is a service use; "mental health" is an institutional use; "employment services" is a professional office use; and "education services" are an institutional use). To summarize, there are zero parcels of land not next to retail uses that meet the other requirements of the zoning ordinance and the Board could not offer any retail examples of harmonious uses. (Doc. No. 35-21); (Doc. No. 36-8 at 3). If the alleged

---

[20] The Shelter must be in the highway-business district; be at least 250 feet away from residences, parks, and schools; have public sidewalks; provide supervision; have at least 50 heated square feet per client; be in harmony with the area; and obtain a conditional use permit ("CUP"). North Wilkesboro Zoning Ordinance §§ 11.4-11, 6.7.1.

[21] Of the 369 parcels in the highway-business district, 95 have sidewalks. (Doc. No. 35-21). Of those 95, 34 are the required distance from residential uses, schools, and parks. *Id.* Of those 34, there are none that are not near retail, church, or gym uses. *Id.*

34

harmonious location for a permitted use only exists in theory, but not reality, that calls into serious question the Board's rationale. *St. Joseph Abbey v. Castille*, 712 F.3d 215, 223 (5th Cir. 2013) ("a hypothetical rationale…cannot be fantasy).

When discussing the perceived lack of harmony, the Board also credited witness testimony expressing concerns that Shelter clients would loiter in the parking lots of the nearby businesses, leading to increased crime, panhandling, and the disturbance of customers to the nearby businesses. As previously stated, mere negative attitudes are not a permissible "rational" basis, but such fears are particularly inappropriate when thinking about "harmony." The Board's concerns about the possibility of increased crime, etc.  are about the *people* who might be at the homeless shelter and not the *land use* relevant to the Zoning ordinance. Furthermore, these concerns hardly distinguish the Shelter from other permitted uses. The Shelter has rules in place, including subjecting items to search and prohibiting weapons, verbal abuse, alcohol, drugs, smoking, harassment, and sex offenders to limit these concerns. Again, according to Dr. Rice's firsthand testimony, he had received no complaints from neighbors about the Shelter, saw no noticeable increase in trash outside the church, had experienced no loitering, and had heard no issues from other tenants at the church. To attempt to distinguish the Shelter based on the clientele it serves reflects nothing more than improperly using a land use regulation to regulate people.

Courts correctly show deference to state zoning regulations. *Siena Corp. v. Mayor & Rockville Md.*, 873 F.3d 456, 465 (4th Cir. 2017). But such deference cannot be an excuse for the Court to abdicate its duty to protect the constitutional rights of all people. While homeless individuals face many challenges, attaining equal protection of the law under the Constitution ought not be one of them.  North Wilkesboro intentionally treated the Shelter differently from other similarly situated uses, and there is no rational basis for the difference in treatment. This is

impermissible under the Fourteenth Amendment. *See Sioux City Bridge Co. v. Dakota County*, 260 U.S. 441, 43 S.Ct. 190, 67 L.Ed. 340 (1923). Therefore, the CUP requirement violates the Equal Protection Clause as applied to the Shelter.

## IV.    ORDER

**NOW THEREFORE IT IS ORDERED THAT**:

1. Plaintiffs' "Motion for Summary Judgment" (Doc. No. 34) is **GRANTED**;

2. Defendant's' "Motion for Summary Judgment" (Doc. No. 32) is **DENIED**;

3. This matter is **REMANDED** to the Board of Adjustment of the Town of North Wilkesboro with instructions to **GRANT** Catherine H. Barber Memorial Shelter, Inc.'s Conditional Use Permit. Alternatively, this Court **GRANTS** a permanent injunction enjoining the Town of North Wilkesboro and its Board of Adjustment from, respectively, enforcing the Conditional Use Permit requirement against Catherine H. Barber Memorial Shelter, Inc.

4. With respect to Plaintiff's request for compensatory and nominal damages and for an award of Plaintiff's costs and expenses in this action, together with reasonable attorneys' fees, pursuant to 42 U.S.C. § 1988 and N.C.G.S. § 6-21.7, to the extent that the Parties cannot resolve those issues by consent, Plaintiff is directed to file a motion detailing its requests on or before January 21, 2022

**SO ORDERED ADJUDGED AND DECREED**.

Signed: December 20, 2021

Kenneth D. Bell
United States District Judge

36